Tracy JACKSON, Appellant,

v.

CITY OF BLUE SPRINGS,
et al., Respondents.

No. WD 49401.

Missouri Court of Appeals,
Western District.

June 13, 1995.

As Modified Aug. 1, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 1995.

Application to Transfer Denied
Sept. 19, 1995.

Michael A. Knepper, H. William McIntosh, Stites, McIntosh, Knepper & Hopkins, Kansas City, for appellant.

Lance W. LeFevre, Kansas City, for respondents.

Before FENNER, C.J., P.J., and HANNA and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Plaintiff Tracy Jackson was seriously injured in an automobile accident at the intersection of Locust Street and Adams Dairy Road in Blue Springs, Missouri. Mr. Jackson alleges that defendants Clarence and Elizabeth Watson own the corner lot which lies adjacent to and north of Locust Street and adjacent to and east of Adams Dairy Road (hereinafter the "corner lot") in Blue Springs, Missouri and that the Watsons negligently allowed trees, shrubs and brush to grow along both roadways near the intersection, blocking the view of drivers on both Locust Street and Adams Dairy Road. He alleges that this obstruction of the view of drivers in the public roadways is what led to the accident. The trial court entered summary judgment in favor of the Watsons and Mr. Jackson appeals.

## I. *FACTUAL AND PROCEDURAL BACKGROUND.*

On May 30, 1986, Mr. Jackson was a passenger in an automobile operated by Mary Behnke. Their vehicle was westbound on Locust Street where it intersects with Adams Dairy Road. The Behnke vehicle stopped at a stop sign, then pulled into the intersection. Ronald Hanlan, driving a pickup truck southbound on Adams Dairy Road, struck the Behnke vehicle on the passenger side, causing serious injury to Mr. Jackson.

At the time of the accident, there were bushes, shrubs, trees and other vegetation on the corner lot which allegedly obscured the vision of drivers on both Adams Dairy Road and Locust Street. Mr. Watson, in deposition testimony, described the presence of a wild cherry tree only four feet from the edge of Adams Dairy Road near the intersection. His affidavit also acknowledged the presence of shrubs and bushes "within four feet of the east pavement" of Adams Dairy Road.

Larry Miller, the Watsons' neighbor, cut down the vegetation the day after the collision. He stated that the vegetation was overhanging the pavement on Adams Dairy Road and that a car northbound on Adams Dairy Road would actually come into contact with these bushes and shrubs.

### A. *The Behnke Lawsuit.*

On September 10, 1986, Ms. Behnke brought suit for her personal injuries alleging negligence against Mr. Hanlan (the driver of the other car), the City of Blue Springs, Jackson County and the Watsons (the landowners). Mr. Jackson was not a party to the *Behnke* action.

Ms. Behnke proceeded to trial against the Watsons and the City of Blue Springs.[1] At

---

1. Mr. Hanlan was dismissed after settling with Ms. Behnke. Ms. Behnke also dismissed Jackson County after all parties agreed that it was not an owner or occupier of Adams Dairy Road or any adjacent land or of any easements in the area.

the close of Ms. Behnke's evidence, the Watsons moved for a directed verdict on the grounds that Ms. Behnke had failed to present evidence showing that the Watsons owned or controlled the property upon which the vegetation grew. Their motion was granted on the grounds that Ms. Behnke had not "made a case" against them.

Ms. Behnke's case proceeded to the jury against Blue Springs and a verdict was rendered generally in Ms. Behnke's favor on April 27, 1989. The case submitted against Blue Springs was that the City, as owner or occupier of the land, had maintained a dangerous condition at the corner of Locust Street and Adams Dairy Road by allowing vegetation to obstruct Ms. Behnke's vision and the view of Mr. Hanlan. Fault was assessed 5% to Ms. Behnke and 95% to Blue Springs.

### B. *The Jackson Lawsuit.*

Following the trial of Ms. Behnke's suit, Mr. Jackson separately filed suit against the City of Blue Springs, Ms. Behnke and the Watsons on May 29, 1991.[2] Mr. Jackson moved for partial summary judgment against Ms. Behnke and the City of Blue Springs, alleging that they were collaterally estopped to deny liability as a result of the judgment in *Behnke.* The trial court granted summary judgment against them on this basis on December 22, 1992.[3]

Mr. Jackson then proceeded with his claims against the Watsons,[4] and the Watsons moved for summary judgment. In support, the Watsons argued that proof that they owned and controlled the corner portion of the lot, and that the City of Blue Springs did not have an easement over it, was essential to showing that they had an obligation to trim the vegetation at the intersection, citing *Mispagel v. Missouri Highway & Transp. Comm'n,* 785 S.W.2d 279 (Mo. banc 1990). They argued that it was shown as a matter of law that the City of Blue Springs had an easement over the portion of the corner lot abutting the intersection where the accident occurred and that, as a result, they were not responsible for maintenance of the lot and could not be held liable for Mr. Jackson's injuries.[5] The Watsons alternatively argued that Mr. Jackson was collaterally estopped from claiming that they controlled the corner lot because Mr. Jackson had been granted summary judgment against Blue Springs based on his contrary assertion that Blue Springs owned the corner lot.

Mr. Jackson countered that a question of fact exists as to whether Blue Springs had an easement at the time of the accident. If not, and if he could prove that he was injured as a result of the Watsons' negligent failure to properly maintain the vegetation located on the corner lot, then the Watsons would be liable to him under the theories of maintaining a public nuisance and negligence.

Mr. Jackson also alleged that the Watsons were negligent *per se* because they had vio-

---

**2.** In his petition, Mr. Jackson alleged that the City of Blue Springs was liable for negligently maintaining a dangerous condition on the corner lot and that Ms. Behnke was liable for operating the vehicle she was driving in a careless and negligent manner.

**3.** Although this order was revised by the court on January 21, 1993, it remained substantively unchanged.

**4.** Mr. Jackson also sued Mr. Hanlan, Jackson County and Michael Hoppenstedt (owner of the vehicle driven by Mr. Hanlan). The record contains no information as to the status of Mr. Jackson's claims against these defendants, but it appears from the limited information available that the case is proceeding against them below.

**5.** In support of their claim that the City of Blue Springs controlled the relevant portion of the corner lot, the Watsons originally offered documents showing that Blue Springs claimed an easement in April 1987. They also offered the affidavit of Mr. Watson stating that first Jackson County and later Blue Springs mowed and maintained the brush and trees along Adams Dairy Road and that he "believed" Blue Springs had a right of way along that road.

Blue Springs, in responses to Mr. Jackson's request for admissions, declared that there was no easement or right of way of record in May 1986 on the Watsons' property adjacent to the Locust Street/Adams Dairy Road intersection. In addition, evidence from the *Behnke* case showed that (1) Blue Springs owned Adams Dairy Road, but it neither owned nor occupied any portion of the land extending beyond the edge of the road in May 1986 and (2) no easement or right of way existed in favor of Blue Springs or any other person or entity.

lated Section 18–8 of the City Ordinances of the City of Blue Springs which states that:

> [i]t shall be unlawful to ... maintain or permit to remain ... any bushes or plants, on a corner lot within twenty (20) feet of the street line, which obstructs the view, at a height of more than three (3) feet above the level of the existing adjacent street pavement or finished grade as established by the Street Department.

The Watsons countered that the Blue Springs ordinance only created a duty running from the Watsons to Blue Springs, and not to an injured third party such as Mr. Jackson.

On April 26, 1994, the trial court entered its order granting summary judgment against Mr. Jackson "[f]or reasons stated in Defendants Watsons' Motion and supported by authorities contained in their suggestions (three separate pleadings)." It expressly found "no just reason for delay" and designated its order as final and appealable under Rule 74.01(b). Mr. Jackson's motion to reconsider the summary judgment order was overruled by the trial court. This appeal followed.

## II. *Standard of Review.*

 Review of an order granting summary judgment is essentially *de novo. ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). The record is reviewed in the light most favorable to the party against whom judgment was entered, and the latter is given the benefit of all reasonable inferences from the record. *Id.* Unless the moving party establishes that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law, summary judgment is not appropriate. Rule 74.04; *ITT Commercial Fin.,* 854 S.W.2d at 380–82.

Mr. Jackson claims that the trial court erred as a matter of law to the extent it found (1) that collateral estoppel applied, (2) that the theories of negligence and nuisance failed to provide a basis of recovery, and (3) that it rejected his claim of negligence *per se.* He further argues that genuine issues of material fact remain regarding the ownership of the tract and whether an easement existed in favor of the City of Blue Springs; the Watsons' exercise of reasonable care; whether the portion of the Watsons' property on which the trees and bushes were growing is considered to be in a natural or an artificial condition, and whether the vegetation was a cause of Mr. Jackson's injuries.

## III. *MR. JACKSON'S CLAIMS AGAINST THE WATSONS UNDER THE THEORIES OF NEGLIGENCE AND PUBLIC NUISANCE.*

Mr. Jackson asserts that he has stated valid claims against the Watsons under two theories: maintaining a public nuisance and negligence. He argues that obstructing the view of drivers as they travel on the public highway, as the Watsons allegedly did by failing to trim the trees and bushes on the corner lot, must be considered a public nuisance. In addition, Mr. Jackson asserts that the Watsons, as occupiers of the corner lot, were obligated to use reasonable care to make his passage on the abutting public streets safe and that the Watsons negligently breached this duty by allowing the vegetation on the corner lot to obstruct visibility at the intersection.

The Watsons disagree. They assert that the City of Blue Springs had an easement over and controlled the corner lot. They further assert that the trees and bushes growing on the corner lot were natural rather than artificial conditions and that the law imposed no obligation on them to trim or maintain the growth of such vegetation on their land, under either a negligence or a nuisance theory.

As both parties acknowledge, this very issue was presented to the Missouri Supreme Court in *Mispagel v. Missouri Highway & Transp. Comm'n,* 785 S.W.2d 279 (Mo. banc 1990). In *Mispagel,* the plaintiff was injured when the motorcycle he was driving was struck by a car entering the highway from a private drive. Defendants James and Dixie Puckett were fee owners of property adjoining the highway. As here, the plaintiff sued under both negligence and nuisance theories, claiming that the defendants were liable be-

cause they had improperly allowed weeds to grow on the property which obstructed the view of persons entering and using the highway.

*Mispagel* found that the weeds were not on property controlled by the Pucketts because the property was subject to an easement which gave the Missouri Highway and Transportation Commission control of the surface right-of-way to the exclusion of the fee owners. Thus, the Commission, and not the landowners, was responsible for any required cutting and mowing. The Supreme Court held that this lack of control by the landowners precluded imposition of liability on them. It therefore declined to address what it termed the "intriguing and somewhat intricate problem of the liability of a landowner for failing to cut naturally growing vegetation." *Id.* at 282.

■ This case differs from *Mispagel,* in that, as discussed in Section V., *infra,* here a question of fact exists as to whether Blue Springs had an easement over the land on which the offending vegetation grew. As a result, we must reach the question left open in *Mispagel.* We hold that liability may be imposed upon an urban landowner such as the Watsons under the theories of nuisance and negligence for injuries caused to those traveling on an abutting public highway by natural or artificial conditions on the land.

In the following pages of this opinion, we first set out the elements of such a claim sounding in nuisance and in negligence, and then discuss why we believe sufficient facts have been alleged by Mr. Jackson to survive a Motion for Summary Judgment on those theories.

### A. Elements of Nuisance and Negligence Claims Against a Landowner for Injuries to Third Parties Caused by Conditions of the Land.

In the context of injuries to third parties outside of the land caused by unreasonably dangerous conditions of property, courts often treat negligence and nuisance theories of liability as coexisting and practically inseparable. This is because the acts or omissions constituting negligence themselves are usually what also give rise to the nuisance.

■ However, not all negligent actions result in a nuisance and proof of negligence is not necessarily required for a finding of nuisance. 58 Am.Jur.2d *Nuisances* § 9 (1989). Rather, negligence is merely one type of conduct which may give rise to a nuisance, and liability for nuisance depends upon the existence of negligence only if the claim of nuisance is based upon negligence. *Id.* § 82. Nuisance which is premised upon negligence is distinguishable from the underlying negligence in that the nuisance "is a condition that is the result of wrongdoing, surviving the negligent act, while the [negligence] involves the wrongdoing itself." *Id.* § 11.

■ Where, as here, plaintiff sues a possessor of land for injuries arising out of an unreasonable risk of harm from a condition of that land, the standard of care owed by defendant is defined by the relationship existing between the possessor of the land and the plaintiffs. *Harris v. Niehaus,* 857 S.W.2d 222, 225 (Mo. banc 1993). The duty in the instant case, is that of the Watsons, as landowners, to Mr. Jackson, a traveler on an abutting roadway.

#### 1. The Elements of a Claim For Public Nuisance.

Mr. Jackson bases his claim for nuisance on the allegation that the Watsons' failure to trim the vegetation on the corner lot constituted a public nuisance because the vegetation overhung and grew too closely to the adjoining public roadways, thereby creating a dangerous condition.

■ Nuisance is a condition which arises from a person's unreasonable, unwarranted or unlawful use of his own property, causing obstruction or injury to the public, and producing material annoyance, inconvenience and discomfort. Black's Law Dictionary 1065–66 (6th ed. 1990). "A public nuisance, unlike a private nuisance, does not necessarily involve an interference with the use and enjoyment of land, or an invasion of another's interest in the private use and enjoyment of land, but encompasses any unreasonable interference with a right common to the gener-

al public." 58 Am.Jur.2d *Nuisances* § 33 (1989).

In Missouri, growth of vegetation, as well as other conditions of private property which are permitted to create a traffic hazard, have previously been considered public nuisances. *See, e.g., 44 Plaza, Inc. v. Gray–Pac Land Co.,* 845 S.W.2d 576, 580 (Mo.App.1992) (landowner's planting of trees close to road was public nuisance because trees created dangerous hazard for drivers entering and leaving neighboring business); *Boyle v. Neisner Bros., Inc.,* 230 Mo.App. 90, 87 S.W.2d 227, 233 (1936) (store owner maintaining two hundred pound door which, when opened, projected over sidewalk for almost three feet was maintaining nuisance).

■ The elements which Mr. Jackson must show to establish his claim for public nuisance under Missouri law are that the Watsons (1) had a duty to trim the vegetation on the corner lot; (2) that their failure to do so was an "unreasonable interference with common community rights such as the public health, safety, peace, morals or convenience," *City of Lee's Summit v. Browning,* 722 S.W.2d 114, 115 (Mo.App.1986); and (3) that the interference resulted in special injury to himself, differing in kind and not merely in degree from general injury to the public, *Grommet v. St. Louis County,* 680 S.W.2d 246, 251–52 (Mo.App.1984). While Mr. Jackson's allegations and the evidence presented on summary judgement below clearly raise issues as to the two final elements of public nuisance, the issue contested by the Watsons is that of duty. If the Watsons had no duty to maintain the corner lot, they would not be liable for any claim of nuisance resulting from the condition of the lot. On the other hand, if the Watsons are found to have such a duty, the issue as to whether the condition of their land constituted a nuisance becomes a question of fact for the jury. *See Boyle,* 87 S.W.2d at 234.

### 2. The Elements of a Claim For Negligence.

Mr. Jackson also argues that the Watsons, as occupiers of the corner lot, are liable to him under a common law negligence theory. He says they were obligated to use reason-able care to avoid making his passage on the abutting public street unsafe and that by allowing vegetation on their property to obstruct visibility at the intersection, they breached this duty of care. The Watsons counter that there should be no common law duty on the part of a property owner to remove foliage on his own property which allegedly obstructs the vision of drivers on adjoining roadways; they suggest such liability and responsibility fall solely on the public body responsible for maintaining the roadway.

■ Negligence is the failure to exercise the degree of care which a reasonably prudent and careful person would use under the same or similar circumstances. *Kary v. Missouri Highway & Transp. Comm'n,* 687 S.W.2d 692, 693 (Mo.App.1985). The elements of a negligence claim under Missouri law are proof of "(1) existence of a duty on the part of the defendant to protect plaintiff from injury, (2) failure of the defendant to perform that duty, and (3) injury to the plaintiff resulting from such failure." *Nappier v. Kincade,* 666 S.W.2d 858, 860 (Mo. App.1984). Mr. Jackson has clearly pleaded and raised factual issues as to the final two elements of negligence—breach of duty and injury. But, as was true under the nuisance theory, the contested issue remains whether a duty arose on the part of the Watsons to trim the vegetation in the first instance.

### B. Landowner Liability for Nuisance and Negligence For An Artificial Condition Of Land Creating an Unreasonable Risk of Harm to Those Outside the Land.

■ Historically, occupiers of land abutting the public roadways were obligated to use reasonable care to see that the public passage was safe. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 57, at 388–90 (5th ed. 1984). This duty, under theories of both negligence and nuisance, was initially limited to "artificial" conditions. The landowner had no affirmative duty to remedy conditions of purely *natural* origin upon his land, even though they might be highly dangerous or inconvenient to his neighbors. *Id.* at 390–91.

This limitation of liability to artificial rather than natural conditions originated when much of the land was unsettled or uncultivated. It was believed that the burden of inspecting each tree and each other natural condition of the land, and of putting it in safe condition, would have been unduly onerous and out of proportion to any harm likely to result from the off-chance that a passerby would be hurt by some condition on such uncultivated land. *Id.*

This traditional dichotomy of liability for artificial, as opposed to natural, conditions under a nuisance theory is reflected in section 839 of the Restatement (Second) of Torts ("Restatement"). That section provides that a landowner is subject to liability for a nuisance caused while he is in possession of an abatable *artificial* condition if he "knows or should know of the condition and the nuisance or unreasonable risk of nuisance involved" and "has failed after a reasonable opportunity to take reasonable steps to abate the condition or to protect the affected persons against it." [6]

However, contrary to what may be the case in some other contexts, vegetation is not necessarily a "natural" condition. To the contrary, (and perhaps to ensure that the limitation of liability to "artificial" conditions was not extended to situations in which the landowner had created, maintained, or exacerbated the risk of harm), what constitutes a **"natural"** condition has always been very narrowly defined to **include only conditions that are not in any way the result of human activity.** Natural conditions thus include soil that has not been cultivated, graded or otherwise disturbed as well as trees, weeds and other vegetation growing on land that has not been made artificially receptive to it by an act of man. Restatement § 840 cmt. a (1979) (setting out definition of natural condition).

Everything which does not fall within this definition of a "natural" condition, even if it constitutes vegetation, is an "artificial" condition of the land and, under the rules noted above, liability can result if that condition causes an unreasonable risk of harm to persons outside the land. This includes not just buildings and structures, but also vegetation that is planted by the landowner or was planted by the landowner's predecessor as well as vegetation that grows on land only because the land has been plowed or made receptive to it, although the vegetation has not been planted or cultivated by anyone. *Id.*

Restatement section 364 sets out nearly identical rules regarding landowner liability under a negligence theory for causing an abatable artificial condition.[7] Moreover, a "natural condition" is equally narrowly defined in negligence, and, as in nuisance, all other conditions, even vegetation, are artificial conditions. Restatement § 363 cmt. b. (1965).

If a condition is found to be artificial, then the vast majority of courts hold that the landowner is liable, under both negligence and nuisance theories, if it is abatable and it causes injury to one passing on the public

---

**6.** Section 839 states in full:

A possessor of land is subject to liability for a nuisance caused while he is in possession by an abatable artificial condition on the land, if the nuisance is otherwise actionable, and

(a) the possessor knows or should know of the condition and the nuisance or unreasonable risk of nuisance involved, and

(b) he knows or should know that it exists without the consent of those affected by it, and

(c) he has failed after a reasonable opportunity to take reasonable steps to abate the condition or to protect the affected persons against it.

Restatement § 839 (1979).

**7.** Section 364 states in full:

A possessor of land is subject to liability to others outside of the land for physical harm caused by a structure or other artificial condition on the land, which the possessor realizes or should realize will involve an unreasonable risk of such harm, if

(a) the possessor has created the condition, or

(b) the condition is created by a third person with the possessor's consent or acquiescence while the land is in his possession, or

(c) the condition is created by a third person without the possessor's consent or acquiescence, but reasonable care is not taken to make the condition safe after the possessor knows or should know of it.

Restatement § 364 (1965). *See also id.* § 368 ("Conditions Dangerous to Travelers on Adjacent Highway").

highway. This liability results regardless of whether the artificial condition is a building or a tree.[8]

■ Missouri is no exception. In examining liability for "artificial" conditions, Missouri courts have found that a landowner owes a duty to the public passing on abutting roadways and sidewalks to maintain his property in a reasonably safe condition. *See Overholt v. Vieths,* 93 Mo. 422, 6 S.W. 74 (1887) (occupant of land is obligated to take reasonable precautions to prevent injuries to strangers as a result of excavations near a public highway as to be dangerous under ordinary circumstances to persons passing on the way and using ordinary care to keep on the proper pathway); *Buesching v. St. Louis Gaslight Co.,* 73 Mo. 219 (1880) (owner of a lot abutting on a street has a right to maintain excavation opening on his lot, although it abuts on the sidewalk; but he is obligated to guard it to render it secure for those using the sidewalk); *Butts v. National Exchange Bank,* 99 Mo.App. 168, 72 S.W. 1083, 1084 (1903) (owner and possessor of a building owed a duty to the public to maintain its building in such a reasonably safe condition that pedestrians on the abutting sidewalks of the public thoroughfare should not sustain injury). *See also Hasapopoulos v. Murphy,* 689 S.W.2d 118 (Mo.App.1985) (holding liability is proper without regard to whether condition is natural or artificial). Missouri thus clearly recognizes the liability of a landowner to those injured due to artificial conditions of the landowner's property.

As is evident under the above rules, if the trees and bushes which blocked the roadway in the instant case constitute an artificial condition because they were planted, maintained, or cultivated by the Watsons or their predecessors on the land, and if the other elements of negligence or nuisance are proved, then Missouri common law would permit recovery under either a negligence or a nuisance theory.

The record below clearly suggests that the trees and bushes in question in this case are an artificial condition, in that they have been maintained by Jackson County and Blue Springs, and perhaps by the Watsons and their predecessors, but we do not believe the facts are sufficiently developed for us to resolve this issue.[9] We thus must go on to address the issue of whether the Watsons may be held liable if, on remand, it is determined that the trees and other vegetation are a natural, rather than an artificial, condition.

C. *Landowner Liability for Nuisance and Negligence For A Natural Condition Of Land Creating an Unreasonable Risk of Harm to Those Outside the Land.*

■ Over time, many courts began to conclude that the distinction between natural and artificial conditions, developed when much of the land was rural in nature, did not make much sense when applied to the urban or suburban settings in which many persons now live.

This change was first reflected in negligence cases in which a person traveling on the public road in a non-rural area was injured when a tree fell on him. The courts began to hold that, if the landowner was aware or should have been aware of the unreasonable risk of harm presented by the tree, then he could be held liable even if the tree was not planted by the landowner and would be considered to be a natural, rather than an artificial, condition.[10]

**8.** *See, e.g., Rodgers v. Ray,* 10 Ariz.App. 119, 457 P.2d 281, 288 (1969) (negligence and nuisance relating to earthen embankments); *Carson v. Facilities Dev. Co.,* 36 Cal.3d 830, 206 Cal.Rptr. 136, 686 P.2d 656, 665 (Cal.1984) (negligence and nuisance relating to sign and shrubbery); *Evans v. Southern Holding Corp.,* 391 So.2d 231 (Fla.App.1980) (negligence and/or nuisance relating to weeds and equipment); *Langen v. Rushton,* 138 Mich.App. 672, 360 N.W.2d 270, 274 (1984) (negligence relating to tree); *Kolba v. Kusznier,* 252 N.J.Super. 53, 599 A.2d 194, 196–99 (Ct. Law Div.1991) (negligence relating to shrubbery); *Boudreaux v. Sonic Industries, Inc.,* 729 P.2d 514, 517 (Okla.App.1986) (negligence relating to sign).

**9.** The Watsons' evident presumption to the contrary is apparently based on the incorrect belief that vegetation is automatically a natural, rather than artificial, condition. As just discussed, this is not the case.

**10.** *See, e.g., Wisher v. Fowler,* 7 Cal.App.3d 225, 86 Cal.Rptr. 582, 584 (1970) (if land was urban, defendant required to exercise reasonable care to

Restatement section 363, adopted in 1964, recognized this development of the law governing liability under a negligence theory for dangerous conditions of land. That section sets out the traditional rule of non-liability for a "natural" condition, but then states as an exception that:

> A possessor of land **in an urban area is subject to liability** to persons using a public highway for physical harm resulting from his **failure to exercise reasonable care to prevent an unreasonable risk of harm** arising from the condition of **trees** on the land near the highway.

Restatement § 363 (1965) (emphasis added).

This recognition of liability for negligence resulting in injuries to passersby in urban areas caused by trees in their natural condition makes sense. As noted in comment e, this rule:

> requires no more than reasonable care on the part of the possessor of the land to prevent an unreasonable risk of harm to those in the highway, arising from the condition of the trees. **In an urban area, where traffic is relatively frequent, land is less heavily wooded, and acreage is small, reasonable care for the protection of travelers on the highway may require the possessor to inspect all trees which may be in such dangerous condition as to endanger travelers. It will at least require him to take reasonable steps to prevent harm when he is in fact aware of the dangerous condition of the tree.**

*Id.* cmt. e (emphasis added).

Numerous courts have adopted this rule, placing a duty of care on urban landowners to protect those outside their property from injuries caused by natural conditions on their property under both negligence and nuisance theories.[11]

Other cases have gone even further. They hold that, just as it makes little sense to make an arbitrary distinction between liability of urban landowners for natural versus artificial conditions, so it also makes little sense to make such a distinction between rural versus urban landowners. They would hold that rural landowners are liable for natural conditions as long as they knew or should have known of them, just as they have traditionally been held liable for artificial conditions.

The principles upon which these decisions are based are well summarized in Restatement § 840 and the comments thereto. That section sets out the Restatement's formulation of the law governing liability under a **nuisance** theory for a **natural** (as opposed to an artificial) condition.

Subsection 840(1) sets out the original common law rule that a landowner is not liable in nuisance for a natural condition and states that it applies "Except as stated in Subsection (2)." Subsection (2) then sets out an exception which dwarfs, if not swallows, the rule. It provides that:

> A possessor of land who knows or has reason to know that a public nuisance caused by natural conditions exists on his land near a public highway, is subject to liability for failure to exercise reasonable care to prevent an unreasonable risk of harm to persons using the highway.

Restatement § 840(2) (1979).

Under subsection 840(2), although a landowner has no duty to inspect for dangerous

---

prevent an unreasonable risk of harm from his trees near the highway); *Mahurin v. Lockhart,* 71 Ill.App.3d 691, 28 Ill.Dec. 356, 357, 390 N.E.2d 523, 524 (1979) (urban landowner subject to liability for dangerous condition existing on land which causes injury to a traveler on a public way); *Hensley v. Montgomery County,* 25 Md. App. 361, 334 A.2d 542, 545 (1975) (urban landowner's duty of inspection for dead, dying, or decayed trees did not extend to suburban-forest land bordering on public road); *Narsh v. Zirbser Bros., Inc.,* 111 N.J.Super. 203, 268 A.2d 46, 49, 51–53 (Ct.App.Div.1970) (possessor of urban land has duty to persons using adjacent highways to prevent his trees from injuring them); *Heckert*

*v. Patrick,* 15 Ohio St.3d 402, 403–05, 473 N.E.2d 1204, 1206–07 (1984) (urban landowner liable for harm to users of public highway by trees near the highway; rural property owner not liable for injury to highway users unless danger created by tree was apparent); *Estate of Durham v. City of Amherst,* 51 Ohio App.3d 106, 108–09, 554 N.E.2d 945, 948 (1988) (landowner in urban area had duty to exercise reasonable care to prevent unreasonable risk of harm to others from decaying trees of which the homeowner had actual or constructive notice).

**11.** *See* cases cited in note 10.

natural conditions, if the possessor knows of the condition or has reason to know of it, he does have a duty to act reasonably with regard to its removal. What the possessor knows or has reason to know about the harmful nature of physical conditions on his land depends upon the facts of which the landowner is aware and the inferences that a reasonable landowner could draw from the facts. *See* Restatement § 839 cmt. i (1979).

Although section 840 directly addresses only nuisance liability, the comments note that its rationale applies equally to negligence, and specifically refers the reader to section 363 and negligence cases cited under it. Restatement § 840 cmt. c (1979). The comments suggest that, under both theories, liability is imposed based on the landowner's failure to meet his duty to exercise reasonable care to protect passers-by from harm caused by a condition of his land.

Various courts have applied the rationale set out in section 840 in imposing liability for injuries caused by either natural or artificial conditions, whether the land is rural or urban in nature. These courts basically hold that liability based on an arbitrary distinction between urban and rural land is meaningless and unjustified. As a policy matter, they assert that liability is more logically based on whether one's actions were reasonable, rather than whether one lives in a rural or urban area or whether a condition is natural or artificial. *See, e.g., Sprecher v. Adamson Cos.*, 30 Cal.3d 358, 178 Cal.Rptr. 783, 636 P.2d 1121 (1981) (uphill landowner owed legal duty of reasonable care to downhill landowner); *Harvey v. Hansen*, 299 Pa.Super. 474, 445 A.2d 1228 (1982) (rejected liability of landowner to persons outside property based on artificial versus natural condition); *Hamric v. Kansas City S.R. Co.*, 718 S.W.2d 916 (Tex.App.1986) (owner or occupier of premises abutting a highway has a duty to exercise reasonable care not to jeopardize or endan-

ger the safety of motorist using the highway as a means of passage).

**D. *Missouri Law Governing Liability In Negligence and Nuisance for a Dangerous Condition on Urban Land Which Causes Injury to One Not On the Land.***

The uncontested evidence in this case is that the land in question is within the City of Blue Springs and is required by ordinance to be maintained and indeed has been maintained by someone (exactly by whom is in dispute) for many years. The land is clearly not rural.[12] Thus, the issue before us is whether liability would be imposed on an urban landowner, such as the Watsons, if the condition is natural rather than artificial.

We find that, in the case of an urban landowner such as the Watsons, Missouri aligned itself with those jurisdictions basing liability on whether the landowner exercised due care, rather than on any distinction between natural and artificial conditions, in *Hasapopoulos v. Murphy*, 689 S.W.2d 118, 119–21 (Mo.App.1985).

*Hasapopoulos* dealt with the liability of a landowner to his neighbor for damage caused by encroaching trees.[13] It specifically refused to base liability on whether the trees constituted an artificial or a natural condition, stating that, "[a]lthough some jurisdictions have applied the 'natural/artificial' dichotomy as a test of liability in encroaching tree cases, it has been criticized and rejected by most." *Id.* at 119 (citations omitted). *Hasapopoulos* noted that strong reasons existed for rejecting such an artificial distinction. These included:

the virtual impossibility of obtaining evidence concerning the origin of trees in many instances; the unfairness in imposing liability upon one who plants or nurtures a tree to a stately and aesthetic appearance while excusing one who ne-

---

12. For guidance as to what constitutes a rural or urban area, see, e.g., § 394.020(3), RSMo 1994 (defining rural area for purposes of Rural Electric Cooperative Act); § 620.160, RSMo 1994 (defining rural area for purposes of economic development); § 226.510(6), RSMo 1994 (defining urban area for purposes of Billboard Act).

13. While *Hasapopoulos* thus dealt with a private nuisance, it relied on law discussing public and private nuisances, including Restatement sections 839 and 840 as well as cases basing liability on negligence theories. It is thus applicable under both theories.

glectfully permits the growth of unsightly scrubs; [and] the problems inherent in assessing the effect of human intervention by watering, fertilizing, pruning, etc.

*Id.* at 119–20.

Although *Hasapopoulos* dealt with an urban setting, it also noted that the recognition of a distinction between artificial and natural conditions has led some courts to distinguish between when liability will be imposed in rural versus urban settings, stating:

A need for divergent application of the 'natural/artificial' distinction depending upon locality has also been noted. In non-populous, rural areas the onerous burden of inspecting all vegetation upon large tracts of land to discover developing hazards from natural growth is said to override the slight potential for harm, whereas in urban areas the relative ease of discovery combined with the increased danger renders the converse true.

*Id.* at 120. *Hasapopoulos* basically concluded that liability should depend on the reasonableness of the landowner's conduct. In so doing, it cited and relied on cases decided under both negligence and nuisance theories. *Id.* at 120–21.

The rationale of *Hasapopoulos* governs here. We agree that Missouri is among the growing number of jurisdictions which hold that the distinction between natural and artificial conditions is arbitrary and serves no useful purpose in an urban setting such as this one. In Missouri, as in these other jurisdictions, the question of whether a condition is artificial or natural is not determinative of liability, but rather is simply a factor to be considered in determining whether the urban landowner exercised reasonable care to avoid creating an unreasonable risk from vegetation growing on his property. This is true under both the negligence and nuisance theories of common law liability pleaded.

■■ Thus, the relevant issue in determining whether the Watsons, as urban landowners, have breached a legal duty to protect those on the public highway from harm caused by natural as well as artificial conditions on their land·in such a case is whether, in the management of their property, they

acted as a reasonable person would act. *See Hasapopoulos v. Murphy,* 689 S.W.2d 118 (Mo.App.1985); *Sprecher v. Adamson Cos.,* 30 Cal.3d 358, 178 Cal.Rptr. 783, 636 P.2d 1121 (1981); *Harvey v. Hansen,* 299 Pa.Super. 474, 445 A.2d 1228 (1982); *Hamric v. Kansas City S.R. Co.,* 718 S.W.2d 916 (Tex. App.1986). The factors to be considered in evaluating the reasonableness of the possessor's conduct include, but are not limited to, what the landowner knew or should have known about the condition, the likelihood of injury, the probable seriousness of such risk, the burden of reducing or avoiding such risk, the location of the land, whether the condition is artificial or natural, and the possessor's degree of control over the risk-creating condition. *Sprecher,* 636 P.2d at 1128–29.

## IV. *MR. JACKSON CANNOT RECOVER UNDER THE THEORY OF NEGLIGENCE PER SE.*

■■ Mr. Jackson also alleges that the Watsons violated Blue Springs ordinance No. 18–8 and that this violation constitutes negligence *per se.* The Blue Springs ordinance states that:

(a) *Prohibited.* It shall be unlawful to construct or maintain or permit to remain, any fence or other structure, or any bushes or other plants, on a corner lot within twenty (20) feet of the street line, which obstructs the view, at a height of more than three (3) feet above the level of the existing adjacent street pavement or finished grade as established by the street department.

(b) *Penalty.* Any person violating any of the provisions of this section shall be fined not less than five dollars ($5.00) nor more than two hundred dollars ($200.00) for each offense; and a separate offense shall be deemed committed on each day during or on which any such obstruction to the view is permitted to remain after such notice from the police department, or any official of the city, to remove same.

■■■ The violation of a municipal ordinance, designed for the protection of the person claiming to have been injured by reason of the violation, has been held to be negligence *per se.* *Wells v. Henry W. Kuhs*

*Realty Co.,* 269 S.W.2d 761, 767 (Mo.1954). However, the maintenance of streets and sidewalks is a governmental function and an abutting landowner has no duty to repair or maintain public streets or sidewalks. *Lange v. Wehrenberg Theaters,* 870 S.W.2d 880, 884 (Mo.App.1993). The municipality cannot shift its responsibility to a private person by ordinance or otherwise; failure to comply with such an ordinance will not render the offender liable except to the government. *Riley v. Woolf Bros.,* 236 Mo.App. 661, 159 S.W.2d 324 (1942).

The Watsons argue that the Blue Springs' ordinance relied upon by Mr. Jackson "merely create[d] a duty flowing from [the owner] to the City . . . and the liability for failure to comply with such ordinance [could not] exceed the fines or penalty prescribed therein," quoting *Lange,* 870 S.W.2d at 884. Even if violation of the ordinance could in other circumstances serve as the basis for a negligence per se theory, however, the Watsons argue that, as a matter of law, they cannot be found to have violated the ordinance.

We agree with the latter argument. The ordinance states that an offense shall occur only "after such notice from the police department, or any official of the city, to remove same." It is uncontested that the Watsons received no notice from Blue Springs to remove the offending bushes and tree. In the absence of such notice, they were not in violation of the ordinance, and a negligence per se theory is inapplicable. Because of our resolution of this issue, we do not reach the other argument against *per se* negligence offered by the Watsons.

## V. SUMMARY JUDGMENT WAS NOT PROPER ON THE ISSUE WHETHER THE WATSONS OWNED OR CONTROLLED THE PORTION OF THE CORNER LOT WHICH FRONTED ON LOCUST AND ADAMS DAIRY ROADS.

Finally, the Watsons argued below, and argue on appeal, that *Mispagel* precluded liability because Mr. Jackson could not prove that they owned and controlled the portion of the corner lot abutting the road where the allegedly offending vegetation was growing.

They argue that this is so on one or both of two alternative grounds: (1) Mr. Jackson is estopped from asserting that they owned that land under the doctrines of either collateral or equitable estoppel, or alternatively, if estoppel does not apply, then (2) the evidence conclusively shows that Blue Springs controlled the intersection at the time of the accident and had an easement over the portion of the corner lot fronting on the intersection.

As noted earlier in Section III., we agree with the Watsons that *Mispagel* held that a government entity's easement or right-of-way over property abutting a public road, with the attendant right to control the surface thereof to the exclusion of the owners of the abutting land, normally relieves the landowners of any obligation as to vegetation growing thereon. *Mispagel v. Missouri Highway & Transp. Comm'n,* 785 S.W.2d 279 (Mo. banc 1990). We also agree that it therefore was incumbent upon Mr. Jackson to prove that the Watsons owned and controlled the portion of the corner lot abutting the intersection. However, we disagree that Mr. Jackson is collaterally estopped to prove ownership or control by the Watsons. We further disagree that no issue of fact exists as to whether the City of Blue Springs had an easement over the portion of the corner lot abutting the intersection.

### A. *Mr. Jackson Is Not Collaterally Estopped or Equitably Estopped From Arguing that The Watsons Own the Corner Lot and that The City of Blue Springs Does Not Have An Easement Over It.*

█ The Watsons' estoppel arguments are different on appeal than those advanced for summary judgment. The Watsons argued in the court below that the December 22, 1992 order granting partial summary judgment against the City of Blue Springs included an implicit:

finding that the defendant City of Blue Springs was the owner of the property in question because such Order was predicated upon the verdict in *Behnke* . . . . As a result, for the same reasons advanced by the plaintiff to support his motion for Par-

tial Summary Judgment against the defendant City of Blue Springs, which defendants Watson incorporate by reference, **the plaintiff is now collaterally estopped from claiming that the defendants Watson owned the subject property.** (emphasis added). In other words, the Watsons argued that Mr. Jackson was himself collaterally estopped from proving that the Watsons owned the property on which the vegetation grew and thus, under *Mispagel,* Mr. Jackson could not recover from them under any theory of liability.

Mr. Jackson, in response, argued that the issue of ownership or control of the corner lot was never decided or even considered by the jury in *Behnke.* He alleged that there was no essential element of property ownership underlying the *Behnke* judgment which would absolve the Watsons from liability in this action and that, in any event, collateral estoppel based on a suit to which he was not a party had no application to his claim against the Watsons.

On appeal, the Watsons concede that collateral estoppel cannot bar Mr. Jackson from litigating the questions of the Watsons' ownership of the corner lot, the absence of any encumbrance thereon, and their liability for the condition of the property for the simple and determinative reason that Mr. Jackson was not a party to the *Behnke* litigation nor in privity with any party thereto. He therefore did not have a full and fair opportunity to litigate the issues raised therein and, as a result, cannot be collaterally estopped by the judgment in that action. *See State ex rel. Haley v. Groose,* 873 S.W.2d 221, 223 (Mo. banc 1994) (due process prohibits application of collateral estoppel against persons not parties or in privity with parties to prior litigation).

■ The Watsons now argue, however, that, while Mr. Jackson is not collaterally estopped from suing them, he should be found to be "equitably estopped" from claiming that they owned the corner lot. As the Watsons state their argument:

Having availed himself of the estoppel effect as to the City of Blue Springs of the judgment against it [in *Behnke* ], Plaintiff now adopts a revisionist view of the record

he created by contending that the City's liability was really premised on that portion of the vegetation which was allegedly overhanging the roadway, something that finds no expression whatsoever in the position previously taken by him in his Motion for Partial Summary Judgment.

■ Equitable estoppel is a doctrine distinct from collateral estoppel. As noted above, collateral estoppel applies to prevent a party or its privy from relitigating an issue actually litigated in a prior lawsuit. By contrast, equitable estoppel is, inherently, an equitable doctrine. It forecloses one from denying his own expressed or implied admission which was in good faith accepted and acted upon by another. *Lugena v. Hanna,* 420 S.W.2d 335, 341 (Mo.1967).

■ Equitable estoppel requires: (1) an admission, statement, or act inconsistent with the claim afterwards asserted and sued upon, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement or act. *Missouri Highway & Transp. Comm'n v. Myers,* 785 S.W.2d 70, 73 (Mo. banc 1990). Equitable estoppel is not a favorite of the law and will not be lightly invoked; it should be applied with care and caution and only when all elements constituting estoppel clearly appear. *G.M. Morris Boat Co. v. Bishop,* 631 S.W.2d 84, 88 (Mo.App.1982).

The Watsons have failed to prove the required elements for the application of equitable estoppel. While they allege that Mr. Jackson is taking a position contradictory to the one he earlier took in obtaining summary judgment against the City of Blue Springs, there is no evidence of any action taken by the Watsons in reliance on any admission, statement or act by Mr. Jackson. Neither is there any evidence that Mr. Jackson admitted that the City of Blue Springs owned or controlled the corner lot.

To the contrary, Mr. Jackson simply claimed, correctly, that the City of Blue Springs was itself collaterally estopped from denying that it owned or controlled the cor-

ner lot and therefore that summary judgment against it was proper on that issue. That is all that the grant of partial summary judgment to Mr. Jackson against the City of Blue Springs determined.

In effect, the Watsons still seek to collaterally estop Mr. Jackson, as well as the City of Blue Springs, based on the prior judgment against the City, despite the fact that Mr. Jackson was not a party to that action. That is, the Watsons seek to penalize, or estop, Mr. Jackson from asserting an issue simply because he exercised his right to use collateral estoppel against the City of Blue Springs. Equitable estoppel may have applied to Mr. Jackson if he had used these facts to his advantage in some other fashion, but there is no evidence before this Court of such use. We, therefore, do not find that summary judgment was properly granted to the Watsons based upon either collateral or equitable estoppel.

**B. *A Question of Fact Exists As to Whether Blue Springs Had An Easement, Right-of-Way or Other Encumbrance Over the Portion of the Corner Lot Abutting the Intersection.***

 The second basis advanced by the Watsons for summary judgment was that they had shown, as a matter of undisputed fact, that "the City of Blue Springs had control over the surface of the purported right-of-way to the extent necessary for highway purposes, to the exclusion of the defendants Watson since 1971. Therefore, the defendant City of Blue Springs, and not the defendants Watson, were responsible for any cutting and/or mowing of the shrubs and trees."

In support, the Watsons offered the affidavit of Mr. Watson, which stated that the roadside property was conveyed to him and his wife on October 5, 1970, by warranty deed, with the exclusion of "that part [of the property] in Adams Dairy Road." He further stated that Adams Dairy Road was originally constructed and owned by Jackson County, that the road and the property abutting it, including the corner lot, was mowed and otherwise maintained by Jackson County

until the area was annexed by the City of Blue Springs in approximately April 1971 and that the City continued to perform this same maintenance. Ms. Behnke, by affidavit, stated that, between July 1986 and July 1987, she had seen City workers performing road construction, maintenance and repair on Adams Dairy Road.

Mr. Watson also stated that Blue Springs owned Adams Dairy Road and mowed the property adjacent thereto in the past. He additionally stated his belief that Blue Springs had a right-of-way along Adams Dairy Road and that the City claimed an existing right-of-way along Adams Dairy Road. Mr. Watson referred to a letter sent to the Watsons in 1987 by the City of Blue Springs, in contemplation of some improvements in this area, which set out the "existing City right-of-way" including a 25-foot easement on either side of the center of the pavement of Adams Dairy Road.

Finally, the Watsons relied on admissions of the City of Blue Springs made in response to Mr. Jackson's request for admissions. The City of Blue Springs admitted that, in May 1986, the City maintained that portion of Adams Dairy Road at or about its intersection with Locust Street and specifically maintained a schedule of mowing and trimming near the northeast corner adjacent to the intersection of Locust Street and Adams Dairy Road.

While the statements were properly considered by the trial court in determining whether a question of fact existed as to the existence of an easement over the property in favor of Blue Springs, they were not binding on either Mr. Jackson or the Watsons. *See Gordon v. Oidtman,* 692 S.W.2d 349, 354–55 (Mo.App.1993) (admissions of a co-defendant are generally not admissible against another co-defendant or third parties). Moreover, Mr. Jackson was free to, and did, controvert the Watsons' statements. Much, but not all, of this evidence came from inconsistent statements made by the City of Blue Springs or by the Watsons during the course of the *Behnke* lawsuit.

For example, while testifying in *Behnke,* Mr. Watson stated that he and his wife had

never deeded or reserved any of [their] property as a right-of-way to the City of Blue Springs at the time of the 1971 annexation, that he did not give Blue Springs an easement in 1987 when the City widened Adams Dairy Road and put in a storm sewer, and that he never gave Blue Springs an easement.

Moreover, Gordon Braun, the Director of Public Works and City Engineer for the City of Blue Springs, stated in an affidavit filed in *Behnke* that the corner lot was "privately owned and not owned by the City of Blue Springs, Missouri," that the City did not possess a right-of-way over the corner lot, and that the City, on or before May 30, 1986, had never maintained or exercised control over the privately owned corner lot, because it was not public property.

Similarly, Mr. Braun, in a deposition taken in *Behnke* as the corporate representative for the City of Blue Springs, testified that, to the best of his knowledge, the land on which the curb running north and south along the east side of Adams Dairy Road, just north of the Adams Dairy Road intersection with Locust Street, was not owned by the City of Blue Springs, and was not the subject of an easement or right-of-way that had been given to the City of Blue Springs. Further, the City specifically admitted below that there was no easement or right-of-way "of record" in May 1986 on the Watsons' property adjacent to the intersection.

Finally, R.D. Keck, the street superintendent for the City of Blue Springs, in an affidavit filed in *Behnke*, stated that, on or before May 30, 1986, the City had never trimmed or maintained the vegetation growing on the corner lot, had never exercised control over the corner lot, and had not maintained or exercised control over the corner lot because it was not public property.

As is self-evident, the evidence on the issue of whether the City had an easement over the corner lot and whether the corner lot was maintained, and if so by whom, was conflicting. This issue therefore was not appropriate for summary judgment. The question of the existence and extent of any easement is instead one for submission to the trier of fact for determination on remand. *Keener v.*

*Black River Elec. Coop.*, 443 S.W.2d 216 (Mo.App.1969) (existence of easement, right-of-way or other encumbrance is a question of fact).

## VI. CONCLUSION

For the reasons stated above, we affirm the grant of summary judgment on negligence *per se*. We reverse the grant of summary judgment on plaintiff's negligence and nuisance theories and remand. We hold that a question of fact exists as to whether the City of Blue Springs had an easement over the land abutting the roadways. We hold that the land in question is urban in nature as it is within the City of Blue Springs and that whether the offending growth is natural or artificial is not determinative, but is simply a factor to be considered by the jury in determining liability under either a nuisance or negligence theory.

All concur.